IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | ) | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:17-CR-279-MOC |
| | ) | |
| v. | ) | |
| | ) | **UNITED STATES' RESPONSE IN** |
| RODNEY JONATHAN MOBLEY | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION FOR DISCOVERY,** |
| | **)** | **DISMISSAL OR PRECLUSION** |
| _____ | ) | |

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and files this response in opposition to Defendant's Motion for Discovery, Dismissal or Preclusion.   In support of its opposition to this Motion, the government states as follows:

## FACTS and PROCEDURAL BACKGROUND

On April 3, 2017, at approximately 9:49 p.m., Charlotte-Mecklenburg Police Department ("CMPD") Officers J. Rubino and J. Helms, riding as a two-man unit, observed a black 2008 Dodge Charger that was sitting at the intersection of West Boulevard and Remount Road, in Charlotte, NC, waiting for the light to change.   The Charger had a dark tinted cover over the license plate making the NC temporary 30-day paper tag on the vehicle illegible, in violation of North Carolina General Statute § 20-63.   When they observed the Charger, Officers Rubino and Helms were unable to read the plate due to the cover.   When the light changed, the Charger turned onto West Boulevard, Officer Helms then activated his blue lights and initiated a traffic stop at 1400 block of West Boulevard.

1

Officer Rubino approached the passenger side of the Charger, and asked the driver, defendant Rodney Mobley, and a female passenger in the front passenger seat for identification and registration. While talking with defendant and the female passenger, Officer Rubino could smell the odor of, what he knew through his training and experience, as un-burnt marijuana emitting from the vehicle. Officer Helms also smelled the odor of marijuana coming from inside of the vehicle.

The officers conducted a probable cause search of the passenger area of the Dodge Charger based upon the odor of marijuana in the vehicle. During the search, Officer Rubino found a black backpack in the rear passenger area of the vehicle. Officer Rubino smelled a strong odor of marijuana coming from the backpack. In the backpack, Rubino found a plastic Walmart shopping bag containing two open boxes of clear plastic sandwich baggies containing suspected marijuana. The CMPD Lab later analyzed the suspected marijuana and determined it to be in fact marijuana with a weight of 121.84 grams. In a separate compartment of the backpack, Rubino found a black Smith & Wesson, Model 9C, 9mm pistol. The pistol was fully loaded and had a round in the chamber. Also located in the backpack were several pay stubs, mail and documents containing the name of Rodney Mobley. Officers also found a digital scale concealed in a Crown Royal velvet bag in the center console.

Defendant was secured in the back seat of a patrol car, and made a spontaneous statement stating that the female passenger had nothing to do with what was found in the car. Mobley told the officers that he was concealing additional marijuana in his underwear. Mobley then removed two clear plastic baggies containing suspected marijuana from his buttocks. The suspected marijuana from Mobley's buttocks was later analyzed by the CMPD Lab and

determined to be in fact marijuana in the amount of 38.66 grams. Defendant was advised of his *Miranda* rights and invoked.

Mobley is a convicted felon, convicted of a prior crime punishable by more than one year. Defendant was a prohibited person not permitted to possess a firearm at the time of the offense, and has not been pardoned or had his civil rights restored.

The firearm that defendant Mobley possessed was a Smith & Wesson, Model 9C, 9mm semi-automatic pistol was manufactured outside of North Carolina, and during the life of the weapon had traveled in and affected interstate commerce.

The police reports written by Officer Helms and Officer Rubino both noted that DMVR footage of the traffic stop, from their police car (vehicle #538), was available. The officers also noted in their police reports that Body Worn Camera ("BWC") footage was also available from the incident.

On September 20, 2017, a federal grand jury in the Western District of North Carolina indicted defendant Mobley on one count of violating 18 U.S.C. § 922(g)(1); one count of violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); and one count of violating 18 U.S.C. 924(c). Defendant's case is set on the May 21, 2018 trial docket.

On January 22, 2018, the government provided defendant with initial discovery in the instant case. This packet of discovery included a disk with the officers' BWC video footage (Officers Rubino, Helms and Gonzalez) from the instant traffic stop and investigation. The initial packet did not include any DWVR video footage of the traffic stop from vehicle #538 because it was not in the government's discovery file.

On February 1, 2018, defense counsel made a specific request for the DMVR video,

3

which was referenced in Officer Rubino's report.   On February 2, 2018, the government requested the case agent to obtain a copy of the DMVR for the government so it could be provided to defendant.   On February 6, 2018, the case agent notified the government that there was no DMVR footage in relation to the instant case.   The government then requested the case agent further investigate whether the DMVR video existed, and, if so, to obtain a copy of it, or determine why there was no DMVR video.   In further investigating the missing DMVR video matter, the case agent contacted CMPD computer technology specialist, Bill Wiktorek, to try to recover the DMVR video or determine what happened to the video.

Mr. Wiktorek searched for the missing DMVR video and could not locate it in the system.   Wiktorek determined that there was no systemic problem with the system during the timeframe of the investigation.   Wiktorek confirmed by reviewing the officers' BWC video that the DMVR was turned on, was working and a video was created.

Mr. Wiktorek indicated that during his investigation that Officers Helms and Rubino advised that they could not find the video on the server several days after the incident.   Officer Helms told Wiktorek that he did not understand why the video was not in the system since he (Helms) said he marked the DMVR video as a felony.

Mr. Wiktorek then further investigated the DMVR system at the Westover Division police station.   Wiktorek searched the Westover DMVR server and found no DMVR videos matching the timeframe of the incident.   Mr. Wiktorek could not find any video ingested into the system from the timeframe at or about the time of the incident.   Wiktorek thought that the video may never have been uploaded into the system and may have been stuck on the vehicle's P2 card.   Wiktorek then removed all of the DMVR P2 cards and uploaded the videos from the

4

cards into the Westover server.   Three days later, Wiktorek checked the Westover DMVR server and did not find the DMVR video from the instant traffic stop investigation from any of the P2 cards that were migrated.   (See Bill Wiktorek's report and TFO Brett Riggs' report attached).

During the course of looking into the matter of the missing DMVR video, the government interviewed Officer Helms and Officer Rubino.   Helms stated that car 538 had a DMVR in it.   The DMVR appeared to be working properly.   Officer Helms said that the DMVR's automatically activate by turning on the blue lights.   He said that the DMVR may also be activated manually or by use of the air horn.   On the date of offense at the intersection of West and Remount, the officers observed that defendant's tag was unreadable.   The officers blue lighted defendant once the light at the intersection changed.   Helms initially said the video began to roll when the blue lights came on.   Helms indicated that he does not know if the DMVR came on but it automatically should have turned on when the blue lights went on.   Helms stated that the DMVR ran the entirety of the stop.   Helms could not remember when he turned the DMVR off.   Helms stated that the practice is not to turn the DMVR off until the officers clear the scene.

Helms indicated that after arresting defendant, he transported defendant to the Westover Division police office.   When he got to the Westover station, he backed 538 into the bay.   Helms is not aware if Westover Division had a wireless automatic upload when police cars entered the bay.   Helms said that the DMVR would blink red if the memory card were full.   He added that there is also a notification in the car if that happens.   Helms has no recollection of the DMVR blinking, and he did not do anything with the DMVR.   Helms said that when a DMVR SIM Card is full, the Sergeant takes it.   Helms stated that the procedure is that once the DMVR is turned off-the recording is made.   A prompt then comes up on the computer screen requesting the file to

be named. Helms said that in cases like this case, he would usually mark the video, "felony stop," and note the Complaint number. In the instant case, Helms has no recollection of doing that. Helms thought that since he was the driver of 538, Officer Rubino probably labeled the DMVR video since he was in the front passenger seat. Helm said that it is possible that he, and not Rubino, did it. Helms also said that it is possible that he forgot to label the video. Helms said he has chosen not to label videos in the past, e.g., in speeding cases where he only issued warning tickets. Helms did not think that he would not label a DMVR video in a felony case. Helms explained that where a label is not put on a DMVR video that the footage remains on the memory card but that there is no reference as to what the video pertains to, except possibly date and time. Helms said that CMPD had a three-year retention policy for DMVR videos of felony cases. However, the policy is there is only a 45-day retention for all other videos. If such videos were not labeled as felony cases, they would be deleted after 45 days. Helms said that he does not recall flagging the video in this case. Helms said that he turned the DMVR on and turned it off. Helms said that he has never removed a memory card. Helms stated that he has served as a patrol officer for over 2 years, but has never had an experience before where a DMVR was made, but the video could not be located. Helms also could not recall not labeling a DMVR in a felony case. Helms said that he had used DMVR's approximately 30 to 40 times. Helms stated that 80% to 90% of the time where he gave a warning ticket case he did not label the video DMVR footage. Helms indicated that the DMVR's were not operating properly in half to two-thirds of the police vehicles that he has driven. Helms could not recall ever having a case where the DMVR was not working where he did not note that fact in the police report.

6

Officer Rubino stated that on April 3, 2017, he was partnered with Officer Helms and they were on patrol in car 538, which was equipped with a DMVR. Rubino was in the passenger seat. Rubino said that as soon as the blue lights went on, the DMVR should have started. In the instant case, just before the stop, the blue lights were turned on and the DMVR should have started. Rubino cannot recall the DMVR in this case not working properly. Rubino said that if the DMVR were not working properly, he would have noted it in his report. Rubino said that DMVR's run until manually turned off. Rubino could not remember when the DMVR was turned off in the instant case. Rubino said that in his experience, the DMVR is turned off after an arrest has been made or after no enforcement action is taken. Rubino said that the DMVR usually is turned off after arrest and when a subject is being transported to Division. Rubino said that this is the policy unless a female or juvenile arrestee is in the car.

Rubino explained that once a DMVR is turned off, a pop up box comes up on the computer where an officer is supposed to label the DMVR video footage with a drop down box that allows the selection of a type of stop to be indicated and a blurb where the Complaint number is supposed to be entered. Rubino's practice is to select one description from the drop down box, e.g., "felony investigation," and then add the Complaint number. Rubino then enters the label into the computer. Rubino has no recollection of doing it in this case, but that would be his practice as the officer in the passenger seat.

Rubino said that as far as he knows, the DMVR automatically uploads into the system when a police car is parked in the bay of the division office. If a DMVR video is mislabeled (e.g., not properly labeled as a felony offense) the video may only be retained for 45 days in the system. Officer Rubino did not know what would happen if the video was not

labeled at all. Rubino explained that DMVR's in cases labeled as felonies are retained for 3 years. All other cases are only retained for 45 days.

Rubino said that in his experience, he has forgotten to label a DMVR video in approximately 50 (fifty) cases. Rubino indicated that this happened in situations where he turned off the DMVR; cleared the investigation and then had to respond quickly to another call and did not have time or forgot to label the DMVR video. Rubino said that none of those cases went to trial. It was Rubino's understanding that once the DMVR is re-started (e.g., while responding to another call immediately upon clearing a prior call) that you could not go back and label a previous video. Rubino said that he did not know if that could be done.

Rubino stated the DMVRS often did not work. Rubino noted that while CMPD is transitioning to BWC's, the existing DMVR's are not being maintained. Rubino said that when the DMVR's fail they are removed and are not repaired. Rubino said that the city is not going to pay for storage of both DMVR's and BWC's. Rubino said that most police cars now do not have DMVR's. Rubino said that if a DMVR were not working, he would notate that fact in the police report. In the instant case, if the DMVR were not working, Rubino said that he would have noted that in the report.

The government did its due diligence to try to obtain the missing DMVR video, and to determine what happened to the DMVR video. Nonetheless, despite the efforts of the government, what happened to the DMVR video remains a mystery.

On May 4, 2018, defendant filed a motion for discovery, dismissal or preclusion regarding the missing DMVR. The United States now responds.

8

## LAW and ARGUMENT

The failure of police to preserve potentially useful evidence is not a violation of due process unless done in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Where a defendant makes a claim that the government's loss of potentially exculpatory evidence was a due process violation, the defendant must show bad faith on the part of the police. *Id.* at 57-58. The U.S. Supreme Court stated:

> "[W]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness requirement of the Due Process Clause . . . as imposing in the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

*Id.* (citations omitted). A showing of bad faith would require evidence the police intentionally acted to gain a tactical advantage over a defendant or acted to harass a defendant. *Id.* at 56. Here, there is no evidence the police acted intentionally to destroy or fail to preserve the missing DMVR video. In *Youngblood*, the U.S. Supreme Court held unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process. *Id.* at 58. *See also United States v. Matthews*, 373 Fed. Appx. 386, 390 (4th Cir. 2010) (unpublished *per curiam* opinion).

Negligence on the part of the police in failing to preserve potentially useful evidence is not a due process violation. In the instant case, despite the government performing its due diligence and investigating what happened with the missing DMVR, it is unclear as to why the missing DMVR from vehicle #538 was not preserved. Defendant alleges that Officers Rubino

9

and Helms violated internal CMPD policies for the preservation of DMVR videos. It is, however, unclear whether the officers acted negligently in attempting to mark the DMVR for preservation, or whether there was a technical problem with the DMVR system at the Westover Division station. Assuming *arguendo* that the officers were negligent in attempting to mark the video for preservation and that negligence proximately caused the loss of the video, such negligence does not amount to bad faith. "'[M]ere negligence on the government's part in failing to preserve such [potentially useful] evidence is inadequate for a showing of bad faith.'" *United States v. Matthews*, 373 Fed. Appx. at 390. Negligence, therefore, in the failure to preserve potentially useful evidence is not a due process violation. Defendant's motion to dismiss should be denied.

Defendant alternatively argues that CMPD's failure to preserve the DMVR in the instant case entitles defendant to a spoliation instruction at trial or a motion in limine to prevent the officers from testifying as to what they observed prior to the traffic stop. Spoliation is a sanction commonly used in civil litigation where a party to a lawsuit fails to preserve evidence. *United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011). An adverse inference instruction in a civil case is a remedy used to insure the integrity of the discovery process. *Id.* However, such an instruction requires a showing that the party that failed to preserve the evidence acted in bad faith. *Id.* In the instant case, there is no evidence the police acted in bad faith in failing to preserve the DMVR, and, therefore, no instruction or motion in limine is appropriate (assuming such a remedy would even be available to defendant against the government in the instant criminal case).

Where a spoliation instruction has been used in criminal court, it has usually been used as

10

a remedy where the government requests a jury instruction where there is evidence the defendant intentionally destroyed evidence that incriminated the defendant. *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004). *Boxley*, however, is a case where defendant sought a spoliation instruction against the government for its failure to preserve fingerprint evidence. *Id.* at 762. The Sixth Circuit found that the police in *Boxley* did not intentionally destroy the fingerprint evidence, and, hence, did not act in bad faith. *Id.* at 762-63. However, the Sixth Circuit did find that the police in *Boxley* did not maintain and control the evidence in a manner consistent with good police tactics. *Id.* at 763. Nonetheless, the Sixth Circuit held that the police failure to follow good police practices did not constitute bad faith, and that the defendant's motion for a spoliation instruction was properly denied. *Id.* In the instant case, even assuming the police acted negligently in not marking and preserving the DMVR, such negligence did not constitute bad faith, and the request for a spoliation remedy should be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the United States respectfully requests that the Court deny Defendant Rodney Mobley's motion for discovery, dismissal or preclusion.


RESPECTFULLY SUBMITTED, this the 11th day of May, 2018.


R. ANDREW MURRAY
UNITED STATES ATTORNEY

s/ Robert Gleason
Assistant United States Attorney
N.C. Bar: 16167

11

Attorney for the United States
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (office)
(704) 344-6629 (facsimile)
Robert.Gleason@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this [11th] day of May, 2018, the foregoing Government's Response was electronically served upon Defendant through ECF at the following address: jp_davis@fd.org.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

s/ Robert Gleason
Assistant United States Attorney
N.C. Bar: 16167
Attorney for the United States
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: Robert.Gleason@usdoj.gov

12