UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:17-cr-00279-MOC-DCK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| Vs. | **)** | ORDER |
| | **)** | |
| **RODNEY JONATHAN MOBLEY,** | **)** | |
| | **)** | |
| Defendant. | **)** | |

**THIS MATTER** is before the Court on defendant's Motion to Suppress and Motion for Discovery, Dismissal, or Preclusion ("Motion to Dismiss"). Having considered defendant's motions, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following Order.

**FINDINGS AND CONCLUSIONS**

I.      **Applicable Standard**

Traffic stops implicate the Fourth Amendment because they amount to seizures of the subject vehicle's occupants. Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Traffic stops are akin to investigatory detentions; thus, the standard announced in Terry v. Ohio, 392 U.S. 1 (1968) for determining the legality of an investigatory detention also guides a court's determination as to the legality of a traffic stop. United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). When presented with a motion to suppress in the context of a traffic stop, a court must first determine whether the stop was justified at its inception, which requires that law enforcement officers possessed a reasonable suspicion that crime was afoot before detaining the suspect. Terry, 392 U.S. at 20. If so, a court next determines whether the search and

any resulting seizure was reasonably related in scope to the circumstances justifying it, Terry, 392 U.S. at 20, which means that it was limited in scope and duration. Digiovanni, 650 F.3d at 507.

A police officer may conduct a brief investigatory stop of a vehicle, when the "officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "[I]n connection with such a seizure or stop, if presented with a reasonable belief that the person may be armed and presently dangerous, an officer may conduct a protective frisk." United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008). In assessing whether a Terry stop was supported by reasonable, articulable suspicion, a court must consider the "totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). "Thus, factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004). While an officer's "hunch" will not justify a stop, Terry, 392 U.S. at 27, courts "give due weight to common sense judgments reached by officers in light of their experience and training." Perkins, 363 F.3d at 321.

A reasonable and articulable suspicion that a traffic violation has occurred is a valid basis to conduct a traffic stop under the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id.

II.     The Stop

Based on the testimony received at the hearing, the facts underlying the challenged stop are as follows. On the night of April 3, 2017, defendant was driving a black 2008 Dodge Charger

and had come to a stop in the left-hand turn lane at the intersection of Remount Road and West Boulevard in Charlotte, North Carolina. That intersection was controlled by a stoplight and CMPD Officers J. Helms and J. Rubino were directly behind defendant in a marked police car. Both officers testified that while waiting in the turn lane directly behind the Charger, they observed that the rear license tag was obscured by a tinted plate cover. After the left turn arrow changed to green, Officer Helms initiated a traffic stop by activating the patrol car's blue lights and defendant pulled the Charger over in a reasonable time.[1]

At least four cameras were in use that night: three body warn cameras ("BWCs") of Officers Helms, Rubino, and Gonzales (a backup officer who did not testify); and the DMVR camera, which would have shown the events immediately prior to the stop. Portions of video from all three officers' BWCs were received in evidence and played during the hearing. While the officers testified that police vehicle was equipped with a DMVR and that it would automatically record when the blue lights or other emergency equipment was activated, the video from the DMVR was lost. An expert from CMPD testified that clips from Officers Helms' and Rubino's BWCs showed a flashing red light or circle from the interior of the patrol vehicle which indicated that the DMVR was recording at the time of the stop. The CMPD expert also testified that while he does not know why the video of the stop failed to upload, it could have been due to failing to label the video or activating a program called "Arbitrator" when the patrol car arrived at the station later that night. When it was discovered that the recording was missing, the CMPD expert attempted to recover the file but has been unable to find it.

---

[1]    Extensive testimony concerning the interaction between the officers, driver, and passenger was provided at the hearing, including testimony concerning the discovery of controlled substance and a gun; however, those events are not relevant to either pending motion inasmuch as those motions only challenge the basis for the stop and the loss of a DMVR video.

The passenger in the Charger, the mother of defendant's child, testified that she was familiar with the Charger and with the plate cover as it was affixed that night. She testified that the plate cover did not obscure the view of the plate.

During the hearing, Officers Helms and Rubino testified consistently that the reason they pulled the Charger over was that it had a tinted license plate

## III.     Discussion

### A.     Motion to Suppress

Applying the standard discussed above, the Court has considered whether the stop of the defendant's vehicle was legitimate at its inception. Here, the given reason for the stop was an obscured license plate. In North Carolina, it is unlawful to obscure or partially obscure a license plate. N.C.Gen.Stat. § 20-63(g). That statute provides, as follows:

> ***Alteration, Disguise, or Concealment of Numbers.*** - Any operator of a motor vehicle who shall willfully mutilate, bend, twist, cover or cause to be covered or partially covered by any bumper, light, spare tire, tire rack, strap, or other device, or who shall paint, enamel, emboss, stamp, print, perforate, or alter or add to or cut off any part or portion of a registration plate or the figures or letters thereon, or who shall place or deposit or cause to be placed or deposited any oil, grease, or other substance upon such registration plates for the purpose of making dust adhere thereto, or who shall deface, disfigure, change, or attempt to change any letter or figure thereon, or who shall display a number plate in other than a horizontal upright position, shall be guilty of a Class 2 misdemeanor. Any operator of a motor vehicle who shall willfully cover or cause to be covered any part or portion of a registration plate or the figures or letters thereon by any device designed or intended to prevent or interfere with the taking of a clear photograph of a registration plate by a traffic control or toll collection system using cameras commits an infraction and shall be penalized under G.S. 14-3.1. Any operator of a motor vehicle who shall otherwise intentionally cover any number or registration renewal sticker on a registration plate with any material that makes the number or registration renewal sticker illegible commits an infraction and shall be penalized under G.S. 14-3.1. Any operator of a motor vehicle who covers any registration plate with any frame or transparent, clear, or color-tinted cover that makes a number or letter included in the vehicle's registration, the State name on the plate, or a number or month on the registration renewal sticker on the plate illegible commits an infraction and shall be penalized under G.S. 14-3.1.

Id. This provision also applies to temporary tags. N.C.Gen.Stat. § 20–79.1(k); see also United States v. Gallardo-Gonzalez, 331 Fed. App'x. 255, 257 (4th Cir. 2009).

Where an officer observes that a license plate is obscured, that circumstance would give rise to a reasonable, articulable suspicion that a traffic offense has occurred. A traffic stop is constitutional if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." Wardlow, 528 U.S. at 123. Only "'some minimal level of objective justification'" is required. United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted).

In this case, defendant argues that the plate was not obscured as it could clearly be seen in the officers' BWC videos. This Court also observed the videos and does not agree with defense counsel's conclusion based on a totality of the circumstances. First, the BWC video referenced was recorded when the officers got out of their patrol car and approached the rear of the vehicle and inspected the tag. While the large numbers show the expiration date were faded, even upon close inspection the numbers along the bottom of the tag remained obscured. Also in evidence is the fact that these videos were aided by powerful take down lights and at least one flashlight that better illuminated the tag and only came on after the stop was initiated. Further, the officers actually investigating the tag lends credence to their testimony that such was the reason for the stop. Further, one officer can be heard on the audio portion of the video explaining to defendant that the reason for the stop was the tag being obscured by the plate cover.

Defendant next argues that had the DMVR video been preserved, it would have shown that the plate was not obscured. Defendant's conclusion is speculative. First, it is undisputed that the temporary tag was in fact covered by a tinted plate cover, which is illegal in North Carolina if it obscures the plate. N.C.Gen.Stat. § 20-63(g). Second, what is important is what these officers observed seated in their patrol car on April 3. Here, the Court has the testimony of the officers,

5

which was consistent and which the Court determined was highly credible. The Court found particularly credible the testimony of Officer Rubino, who the Court determined testified truthfully. Indeed, at the conclusion of the examination by counsel, the Court questioned Officer Rubino directly as to what happened to the DMVR video and pointedly asked him whether the video had been destroyed. The Court has no reason to believe that Officer Rubino perjured himself or destroyed evidence. While the defense asks this Court to conclude that the officers acted in "bad faith" as discussed below, none has been shown in this case. It would confound logic to conclude that two career officers would conspire to destroy only a portion of the video evidence of what appeared to be an ordinary and by-the-book traffic stop. Put another way, had there been a shooting or a claim of excessive force when the tape went missing, a strong motive would have existed that could lead to a reasonable suspicion of tampering. Based on the testimony this Court heard from these officers, they would have had no reason to destroy the video as it is clear from their credible testimony that they honestly perceived that the tag was obscured by the tinted tag cover, the existence of which is not questioned.[2] Thus, there is no reason for the Court to apply principles of spoliation to the evidence presented and assume that the DMVR would have been exculpatory.

Thus, in determining whether the traffic stop was legitimate at its inception the Court must consider a totality of the circumstances. Here, it is unquestioned that the tag was covered with a tinted tag cover. It is also clear that the officers observed the tag from the front seat of the patrol car at night from what may have been some 20 feet back. Each officer testified consistently that they believed the tag had been obscured by the plate cover in violation of North Carolina law.

---

[2]    The Court has also considered the testimony of the car's passenger that the tag cover did not obscure the tag. While the Court has no reason to discredit her testimony, her perspective was not that of the officers seated in the patrol car on the night of April 3.

North Carolina law makes it unlawful for an operator to "cover[] any registration plate with any frame or transparent, clear, or color-tinted cover that makes a number or letter included in the vehicle's registration, the State name on the plate, or a number or month on the registration renewal sticker on the plate illegible …." N.C.Gen.Stat. § 20-63(g). That law applies with equal force to temporary tags. N.C.Gen.Stat. § 20–79.1(k). Further, the video recording that do exist show that the officers actually investigated the tag after the stop, which are acts consistent with the obscured tag being the basis for the stop and not pretext. In addition, an officer can be heard explaining to the defendant that the obscured tag was the reason was for the stop. Most importantly, the Court finds the officers' testimony that the obscured tag was the reason for the stop to be credible.

While the Court understands and joins in the concern with the loss of the DMVR video, it cannot conclude as defendant suggests that the loss was intentional. Indeed, had the officers wanted to "lose" evidence, they did a poor job of it inasmuch as the evidence from the body warn cameras provided defendant with images of a partially readable license plate, which was aided by powerful takedown lights. While DMVRs and BWCs have aided the judicial process in recent years, it must be remembered that technology is not perfect and that data can be lost not just through intentional acts, but through human mistake, technical errors, and systems failures. There is no evidence that suggests that such loss occurred in this case other than through human mistake or technical failure.

As to defendant's argument that temporary tags -- which are usually created by car dealers, using Sharpies of varying states of exhaustion -- create a situation where there is going to be reasonable suspicion to stop any newly purchased car due to dealer penmanship, there is no Fourth Amendment purchase to that argument in this case. Clearly, these officers stopped this car because a tinted cover obscured the temporary plate. The statute, N.C.Gen.Stat. § 20-63(g), does not

provide that defects in the plate or tag as issued are offenses; rather, it is actions of the operator in bending, folding, cutting, altering, or obscuring that is prohibited.

As the "stop" was supported by a reasonable, articulable suspicion under all the circumstances, the stop was appropriate at its inception as is not a basis for suppression. While the officers' actions during the stop must, thereafter, be "reasonably related in scope" to the basis for the stop, United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015), defendant does not challenge the events after the stop. The Motion to Suppress will be denied.

### B.    Motion to Dismiss

As a sanction for the lost DMVR video, defendant seeks a dismissal of the Indictment, a limitation on the evidence that can be introduced at trial, further discovery, and that the Court provide a spoliation instruction.

To the extent the Constitution imposes a duty upon the government to preserve evidence, see California v. Trombetta, 467 U.S. 479, 485 (1984), "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense," which would be evidence that is constitutionally material. Id. at 488–89. To satisfy this standard, evidence must: (1) "possess an exculpatory value that was apparent [to the police] before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489.

Here, defendant proposes that the DMVR video would have been exculpatory as it would have shown that his plate was not obscured. The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy Trombetta's requirement that the exculpatory value be "apparent" to the police before destruction. Arizona v. Youngblood, 488 U.S. 51, 56 n.* (1988). Indeed, there was no testimony (or even an inquiry) as to whether either officer

reviewed the DMVR before it was lost or, for that matter, whether there was any ability to review the DMVR from the patrol car or otherwise by the officers without first uploading it to the CMPD system. Thus, no evidence has been presented to the Court that would satisfy the first Trombetta factor.

Where the first factor is not met, "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." United States v. Bohl, 25 F.3d 904, 910 (10th Cir.1994) (citing Youngblood, 488 U.S. at 58, 109 S.Ct. 333), cited with approval, United States v. Matthews, 373 Fed. Appx. 386, 390 (4th Cir. 2010). It is only when the "defendant can show bad faith on the part of the police[ ] [that] failure to preserve potentially useful evidence" amounts to the denial of due process. Youngblood, 488 U.S. at 58.

Bad faith "requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000). A showing of mere negligence is not adequate for a showing of bad faith. Bohl, 25 F.3d at 912. At most, defendant has presented evidence that the officers *may* have been negligent in failing to name the video or activate a program which was necessary for the video to automatically upload to the server when the vehicle pulled into the police station. The defenses assertion that these officers acted intentionally is without support as the Court has determined that these officers testified credibly that they stopped the vehicle due to the plate being obscured by a tinted cover. Thus, at most defendant has presented some evidence that these officers were negligent in either not labeling the file or in not activating "Arbitrator" when they arrived at the station. As negligence does not amount to bad faith, the sanctions defendant seeks will be

denied.  The defendant will, however, be free to robustly examine these officers on this issue at trial.

## ORDER

**IT IS, THEREFORE, ORDERED** that Motion to Suppress (#16) and Motion for Discovery, Dismissal, or Preclusion (#21) are **DENIED**.

Signed: May 21, 2018

Max O. Cogburn Jr.
United States District Judge